UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re: Ellen K. Mady

Debtor.

Case No. 05-44011
Chapter 7
Hon. Marci B. McIvor

_____/

Robert D. Handelsman, PhD PLLC, Employees
Retirement Plan & Trust, a Michigan Trust, Robert
D. Handelsman and Maurine Handelsman,
individually and on behalf of their minor son Dylan
Handelsman,

Plaintiffs

v.

Adversary Case No. 05-5218

Ellen K. Mady,

Defendant.

_____/

## OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the Defendant/Debtor's Motion for Summary Judgment. Plaintiffs Robert D. Handelsman, Ph.D., PLLC, Employees Retirement Savings Plan & Trust, a Michigan Trust, Robert D. Handelsman, Maurine Handelsman, individually and on behalf of their minor son, Dylan Handelsman (hereinafter referred to collectively as "the Plaintiffs") filed a three count Complaint against debtor Ellen Mady seeking to bar discharge under § 727 or have the debt owed by her to the Handelsmans held non-dischargeable under § 523. For the reasons stated in the memorandum, the Motion is be denied.

### Background

The Complaint in this matter arises out of alleged fraudulent investments made

by Debtor's (non-debtor) spouse, Charles Mady (hereinafter "Mady"), on behalf of the Handelsman plaintiffs. Plaintiffs believe that Debtor was an active participant in the fraud.

The Plaintiffs met Mady in the spring of 2000. Charles Mady allegedly told Plaintiffs that he was a skilled commodities futures trader capable of routinely earning in excess of 30% on investments. Plaintiffs invested some small sums with Mady which earned significant returns. Eventually, Plaintiffs invested significant sums of money with Mady pursuant to documents titled "Special Guaranty." Under the guaranties, Mady and his wife, debtor Ellen Mady, unconditionally guaranteed repayment of principal and interest on Plaintiffs' funds as follows:

(6) Special Guaranty dated May 15, 2002: Robert D. Handelsman, Ph.D., PLLC, Employees Retirement Savings Plan & Trust (Investor); Charles and Ellen Mady (Guarantors); Initial investment: $422,500 with a guaranteed return of 7.5% payable by June 15, 2002. Paragraph 2.3 of the guaranty states:

> **Guarantor's Financial Condition**
>
> As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, and other obligations arising out of the investment, Guarantor is, and will be, solvent, and has and will have assets which fairly valued, exceed Guarantor's obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay Guarantor's obligations and liabilities.

The guaranty is signed by Charles and Ellen Mady

(7) Special Guaranty dated February 15, 2002: Dr. Robert D & Dr. Rene Handelsman (Investors); Charles and Ellen Mady (Guarantors); Initial investment: $120,000 with a guaranteed return of 64% payable by June 15, 2002. Paragraph 2.3 **Guarantor's Financial Condition** same as above. The guaranty is signed by Charles and Ellen Mady.

(8) Special Guaranty dated May 15, 2002: Dr. Robert D. & Dr. Renee Handelsman (Investors); Charles and Ellen Mady (Guarantors); Initial investment: $417,500

2

with a guaranteed return of 7.5% payable by June 15, 2002. Paragraph 2.3 **Guarantor's Financial Condition** same as above. The guaranty is signed by Charles and Ellen Mady.

(9) Special Guaranty dated May 15, 2002: For the benefit of Dylan Handelsman (Investor); Charles and Ellen Mady (Guarantors); Initial investment: $ 18,225 with a guaranteed return of 7.5% payable by June 15, 2002. Paragraph 2.3 **Guarantor's Financial Condition** same as above. The guaranty is signed by Charles and Ellen Mady.[1]

According to the Complaint, the guaranties were requested by Plaintiffs. When Plaintiffs met with Mady and Debtor to sign the first guaranty, Defendant/Debtor allegedly told Plaintiffs that her husband was an "investing genius" and "pointed to [their] lifestyle as evidence of his success". (Plaintiffs' Br. at 3). Though she disclaimed specific knowledge as to how he achieved his investment returns, Debtor allegedly told the Plaintiffs that Mady had successfully invested on their behalf for some time, and "indicated that she felt perfectly secure in providing them with a Guaranty at that time in excess of $1 million."[2] (Plaintiffs' Br. at 3). Debtor told Plaintiffs that she trusted her husband and that he knew what he was doing. (Debtor's Affidavit, ¶ 6, attached to Defendant's Brief). Plaintiffs assert that without Debtor's representations regarding her husband's investing skills, his ability to support their lavish lifestyle and her signature on

---

[1] Copies of the guaranties are attached to the Complaint as Exhibit A. The total invested under these four guaranties is $978,225. According to the Complaint, the total amount owed by Debtor to Plaintiffs is $3,067,641. This includes $1,630,000 invested by the plaintiff Retirement Plan on February 15, 2002 and purportedly supported by a special guaranty (although a copy of that guaranty is not attached to the Complaint). See Complaint p. 5 for Plaintiff's itemized breakdown of the total amount allegedly owed.
The amount owed is in dispute. See Defendant's Brief at 4.

[2] Debtor and Mady lived in an expensive home in Farmington Hills, drove expensive cars, owned race horses, and took lavish vacations. (Defendant's Br. at 6).

3

the special guaranty, they would not have invested money with Mady. (Affidavits of Robert and Maurine Handelsman, attached to Plaintiffs' Brief).

Mady was not a licensed broker and Plaintiffs investments were not repaid as required by the guaranties. On June 12, 2002, the Commodity Futures Trading Commission (CFTC) filed a Complaint against Mady.[3] On August 2, 2002, a Receiver was appointed by the U.S. District Court for the Eastern District of Michigan to liquidate Mady's property.[4] The assets collected and sold by the Receiver were insufficient to satisfy outstanding obligations.[5] To date, Plaintiffs have received approximately $141,000 from the Receiver.

Debtor filed a voluntary Chapter 7 bankruptcy petition on February 24, 2005. She is a podiatrist licensed to practice in Michigan. Included on Debtor's Schedule F is a $4,000,000 joint liability owed to Plaintiffs. Plaintiffs filed the present three-count Complaint against Debtor on May 16, 2005, asserting that under § 523(a)(2)(A) and(B), their claim arises from Debtor's fraud and is non-dischargeable. Plaintiffs also assert that because Debtor has failed to adequately explain the loss or deficiency of assets, she should be denied a discharge under § 727(a)(5). According to Plaintiffs, Debtor

---

[3]The suit alleged, among other things, that Mady "was engaging in unlawful, unlicensed and fraudulent investment and trading activities. . . " (Plaintiffs' Complaint § 19). According to a report filed by the Receiver appointed to liquidate Mady's assets, "[T]he CFTC intends to prove that Mr. Mady defrauded investors out of between $10,000,000 and $12,000,000." (Receiver's Report, attached to Plaintiffs' Brief).

[4]Mady was indicted under federal charges and is in federal custody awaiting trial.

[5]Debtor asserts that the assets were sold for much less than their actual value. Debtor's Motion for Summary Judgment, n. 2. Plaintiffs contend that the Receiver properly disposed of the assets. See Receiver's Report dated January 16, 2002, attached to Plaintiffs' Brief.

4

misrepresented her (and her husband's) financial position to them both verbally and in writing. She enjoyed the benefits of her husband's fraudulent dealing and knew (or should have known) that she was not financially solvent at the time the guaranties were signed. Plaintiffs contend that Debtor was an active participant in her husband's fraud.

Debtor asserts that she had no knowledge of her husband's fraudulent activities. She had no idea what the guaranties were because she never read them before she signed them. She believes that she never misrepresented anything to Plaintiffs nor was she involved in her husband's fraudulent schemes in any way.

## Jurisdiction

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157 and District Court Local Rule 83.50 (E.D. Mich.). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).

## Standard for Summary Judgment

Fed. R. Civ. P. 56(c) for summary judgment is incorporated into Fed. R. Bankr. P. 7056(c). Summary judgment is only appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." Celotex, 477 U.S. 317, 323. A "genuine" issue is one where no reasonable factfinder could return a judgment in favor of the non-moving party. Berryman v. Reiger, 150 F.2d 561, 566 (6th Cir. 1998) (citing Anderson, 447 U.S. at 248). Once the movant meets this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts. If the record taken in its entirety could not convince a rational trier of fact to return a verdict in favor of the non-moving party, the motion should be granted." Cox v. Kentucky Dept. of Transportation, 53 F.3d 146, 149-50 (6th Cir. 1995) (internal quotation marks and citation omitted).

## Count I:  Non-dischargeability Based on Fraud under 523(a)(2)(A)

Section 727 of the Bankruptcy Code provides that a debtor may obtain a general discharge from all debts that arose before the order for relief. 11 U.S.C. § 727(b). However, there are exceptions for certain obligations, including debts for money obtained by fraud. 11 U.S.C. § 523(a)(2)(A). Section 523(a)(2)(A) provides:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt –
> 
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
> 
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

To prevail on a claim under 523(a)(2)(A), a plaintiff must show that: (1) [T]he debtor obtained money or a refinancing of credit through a material misrepresentation

6

that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 280 (6th Cir. 1998).

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994). Plaintiff must show each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Even so, the court must construe all of the exceptions to discharge strictly, and must give the benefit of the doubt to debtor. *Rembert*, 141 F.3d at 281.

Intent, under *In re Rembert*, is measured subjectively. 141 F.3d at 281. A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . A 'dumb but honest' [debtor] does not satisfy the test." *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir., 1997)(citations omitted). A debtor's fraudulent intent,

> may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances' presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Co. 2002)(quoting

7

*Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000)(citations omitted). "A creditor can present proof of surrounding circumstances from which a [c]ourt can infer a dishonest intent." *Commercial Bank and Trust v. McCoy (In re McCoy)*, 269 B.R. 193, 199 (Bankr. W.D. Tenn. 2001).

As explained by the court in *Haney v. Copeland (In re Copeland)*, 291 B.R. 740 (Bankr. E.D. Tenn. 2003):

> Proving the Debtor's intent to defraud is similar to proving the Debtor's knowledge and/or recklessness as to the falsity of the representations made. Because intent is a purely subjective question, the court must examine the totality of the Debtor's actions to determine if she possessed the requisite intent to deceive the Plaintiffs. Any benefit of the doubt must be resolved in favor of the Debtor, as § 523(a)(2) is strictly construed in her favor. *XL/Datacomp, Inc. v. Wilson (in re Omegas Group, Inc.)*, 16 F.3d 1443, 1452 (6th Cir. 1994).

*Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 760 (Bankr. E.D. Tenn. 2003).

### Imputing Intent Between Spouses

In the context of a marital relationship, courts are "reluctant to impute intent from one spouse to another, so as to prevent discharge of the innocent spouse's debt . . . . [T]he marital relationship, by itself, does not always give rise to a legal partnership or agency." *Agribank, FCB v. Gordon (In re Gordon)*, 293 B.R. 817, 824 (Bankr. M.D. Ga. 2003). *See also Myers v. Ostling (In re Ostling)*, 266 B.R. 661, 665 (Bankr. E.D. Mich. 2001) (the acts and omissions of one spouse may not be imputed to another spouse by virtue of their marital status alone).

> The relevant exception is where a plaintiff can show that the passive spouse had 'significant involvement, contact or control, implied or express' over the perpetrator of the fraud." *In re Shane*, 80 B.R. 140, 241 (Bankr. S.D. Fla. 1987). This Court has previously ruled that, in order to impute the actions to the passive spouse, the passive spouse must have actual knowledge of the actions against the plaintiff, encouraged those actions, benefitted from those actions, or have

been personally involved with them. *In re Sager*, Case No. 91-33700 (Bankr. S.D. Fla., Aug. 26, 1003). Other courts have held that even if the passive spouse benefitted from the fraud and possibly had knowledge of it, that passive spouse prevails unless [he/she] actually participated in the fraud. *In re Reed*, 700 F.2d 986 (5th Cir. 1983).

*Kent Enterprises, Inc. v. Maurer (In re Maurer)*, 2004 WL 758178 (Bankr. C.D. Ill 2004). Courts are willing to impute fraud from one spouse to another where there is a legal relationship in addition to the marriage. *See e.g. Love v. Smith (In re Smith)*, 98 B.R. 423 (Bankr. C.D. Ill. 1989)(wife's debt nondischargeable where wife deemed to be an agent of husband); *Neal v. Surls (In re Surls)*, 240 B.R. 899 (Bankr. W.D. Mo. 1999)(wife liable for husband and his corporation's debt under alter ego theory).

In the present case, Debtor argues that she is entitled to summary judgment on this claim because she did not intentionally make any misrepresentations to Plaintiffs (her mere signature on the guarantees should not be construed as a misrepresentation by her), and any misrepresentations made by her husband cannot be imputed to her. The pleadings fail to support this view. The file discloses material issues of fact regarding what Debtor said directly to Plaintiffs, what she inferred to Plaintiffs, and what she intended to convey to Plaintiffs. The Plaintiffs' affidavits indicate their belief that "Debtor knew that she was providing credit enhancement to investment transactions between her husband and the Handelsmans" and that she "assisted her husband in persuading the Handelsmans to invest ever-increasing amounts with Mr. Mady." (Plaintiffs brief at 12). Debtor is a well-educated woman. She does not dispute that she signed the guaranties. The facts surrounding those guaranties (i.e. the extent to which she understood what she was signing and the nature and extent of her husband's activities) are in dispute.

9

Because there are material questions of fact, summary judgment should be denied as to Count I (§ 523 (a)(2)(A)) of the Complaint.

### Count II: Non-dischargeability Based on Fraudulent Writing under § 523(a)(2)(B)

Section 523(a)(2)(B) excepts from discharge debts incurred by use of a false statement in writing. To prevail on a § 523(a)(2)(B) claim, a plaintiff must establish the following elements regarding the writing:

> (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with the intent to deceive.

See Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166 (6th Cir. 1985). A document that is "written, signed, adopted or used by the debtor" qualifies as a statement in writing under this section. Insouth Bank v. Michael (In re Michael), 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001).

Under the first element, a written statement is materially false if the information in it "offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit. Id., citing In re Bogstad, 779 F.2d 370, 375 (7th Cir. 1985). The second element requires that the statement refer to the debtor's financial condition.

The third element requires the plaintiff/creditor to establish reasonable reliance on the written statement. Reasonable reliance is not defined in the Bankruptcy Code. Case law generally holds that it is determined objectively based on the totality of the circumstances. In re Michael, 265 B.R. at 598.

The determination of the reasonableness of the creditor's reliance on a false

10

statement in writing is judged by utilizing such factors as:
> whether there had been previous business dealings between the debtor and the creditor;
> whether there were any warnings that would alert a reasonably prudent person to the debtor's misrepresentations;
> whether a minimal investigation would have uncovered the inaccuracies in the debtor's financial statements; and
> the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness.

Id.

The fourth element requires that the debtor make or publish the statement with "intent to deceive."

> The standard. . . is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied. . . . That is, the debtor must have been under some duty to provide the creditor with his financial statement; but full discharge may be disallowed if the debtor either intended the statement to be false, or the statement was grossly reckless as to its truth.

Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166 (6th Cir. 1985)(citations omitted).

In the Martin case, the bankruptcy court inferred an intent to deceive on the part of a debtor where in a financial statement to the lender he misrepresented that his assets exceeded his liabilities by a 2 to 1 margin, when in fact the debtor's liabilities exceeded his assets by a 3 to 1 ratio. Id. The Martin Court agreed and explained that "[The debtor] intentionally communicated the false statement to the Bank with the expectation that the Bank would rely on it, and he cannot now be heard to say that he did not intend the Bank to continue this reliance." Id. See also, Knoxville Teachers Credit Union v. Parkey, 790 F.2d 490, 491-92 (6th Cir. 1986).

In the present case, it is undisputed that Debtor signed the special guaranties and that those guaranties included language representing Debtor's financial condition

11

to Plaintiffs. As with Count I, the real issue is whether Debtor intended to deceive Plaintiff's regarding her financial condition (and the extent to which Debtor knew and understood her financial condition). There are also questions of fact regarding whether Plaintiffs' reliance on the financial representations in the guaranties was reasonable.

Because there are material questions of fact, summary judgment on Count II should be denied.

## Count III: Failure to Explain Loss of Assets under § 727(a)(5)

Section 727(a) of the Bankruptcy Code provides that a debtor is entitled to a discharge unless one or more of eight exceptions is met. Although exceptions to discharge are strictly construed, *In re Rembert*, 141 F.3d at 281, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wazeter v. Michigan National Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997).

Section 727(a)(5) provides that the Court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities". 11 U.S.C. § 727(a)(5). Objections to discharge under this section require proof by a preponderance of the evidence and the objecting party bears the burden of proof. *Barclays/American Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393-94 (6th Cir. 1994).

> Section 727(a)(5) is broad enough to include any unexplained disappearance or shortage of assets. The initial burden is on the objecting party to introduce some evidence of the disappearance of substantial assets or of unusual transactions. The debtor must then satisfactorily explain what happened.

12

*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000)(citations omitted). "What constitutes a 'satisfactory' explanation for § 727(a)(5) is left to the discretion of the court. *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (1st Cir., 2005).

> At its root, a satisfactory explanation under § 727(a)(5) is one that is reasonable under the circumstances. *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993). At a minimum, however, and has often been said, a satisfactory explanation is one that gives more than a mere vague or indefinite statement. *See, e.g., Floret, L.L.C. v. Sendecky (in re Sendecky)*, 283 B.R. 760, 763 (8th Cir. BAP 2002). An important component in ascertaining the reasonableness of any explanation is its capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency. For example, would the information be sufficient to enable the trustee to track down a potential preferential transfer.

*Baker v. Reed (In re Reed)*, 310 B.R. 363, 370 (Bankr. N.D. Ohio 2004).

Section 727(a)(5) does not include an element of intent or any affirmative defenses. It imposes strict liability on a debtor who does not satisfactorily explain pre-petition diminution or loss of assets. *Baker*, 310 B.R. at 368.

> Based upon the statute's lack of any culpable mental state required for the denial of a discharge, the propriety of the loss, whether for illegal, immoral or otherwise imprudent activities, is not the direct concern of § 727(a)(5); this is left to other sections of the Bankruptcy Code. Rather, when invoking § 727(a)(5), it is simply the adequacy of explanation which is at issue. *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 690 (Bankr. E.D. Pa. 2001). [Additional citations omitted]. Accordingly, as applied to § 727(a)(5), whether the Debtor engaged in the wrongful disposition of assets is only relevant to the extent that it pertains to a satisfactory explanation; in insolation, the alleged wrongful nature of his conduct has no bearing. *Indian Head Nat'l Bank v. Mitchell (In re Mitchell)*, 74 B.R. 457 (Bankr. D.N.H. 1987)(illegal activities in themselves do not operate as a bar to discharge).

*Baker*, 310 B.R. at 368.

There is no question that Debtor and Mady's joint assets were liquidated after a

receiver was appointed on August 2, 2002. However, Debtor did not file for bankruptcy until February, 2005. She earned income in 2003 and 2004 and her bank statements show substantial deposits in her account after joint accounts were frozen. There is a question of fact as to whether Debtor adequately explained what assets she has available to satisfy her liabilities. Summary judgment as to the 727(c)(5) claim is also denied.

## Conclusion

For the foregoing reasons, Debtor's Motion for Summary Judgment is denied.

Marci B. McIvor
United States Bankruptcy Judge

Dated: AUG 2 5 2005
Detroit, Michigan

cc: Paul Steinberg
Timothy Fusco