UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re ELLEN K. MADY

             Debtor.

_____/

ROBERT D. HANDELSMAN, PhD PLLC,
EMPLOYEES RETIREMENT SAVINGS PLAN
& TRUST, a Michigan trust, ROBERT D.
HANDELSMAN and MAURINE HANDELSMAN,
individually and on behalf of their minor son,
DYLAN HANDELSMAN,

             Plaintiffs,

v.

ELLEN K. MADY,

             Defendant.

_____/

Case No. 05-44011
Chapter 7
Hon. Marci B. McIvor

Adv. Pro. No. 05-5218

## OPINION

On May 3 and May 5, 2006, the Court held a trial on Plaintiffs' three-count

Adversary Complaint. The Complaint alleges that the debt owed by Defendant to Plaintiffs

is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(B). The Complaint also

seeks a denial of discharge under 11 U.S.C. § 727(a)(5). For the reasons stated in this

Opinion, the Court finds that Plaintiffs have not met their burden of proof as to the §

523(a)(2)(A) claim or the § 727(a)(5) claim. Those claims are, therefore, dismissed.

However, Plaintiffs have met their burden of proof as to the violation of § 523(a)(2)(B).

Plaintiffs have a non-dischargeable claim against Defendant in the amount of $

2,337,369.94.

# I.  Jurisdiction

Bankruptcy courts have jurisdiction over all cases under title 11 and all core proceedings arising under title 11 or arising in a case under title 11.  *See* 28 U.S.C. §§ 1334 and 157.  Core proceedings include proceedings to determine dischargeability.  11 U.S.C. § 157(b)(2)(I).

# II.  Facts

Plaintiffs Robert and Maurine Handlesman, individually and on behalf of their minor son, Dylan Handelsman, and the Robert D. Handelsman, PhD, PLLC, Employees Retirement Savings Plan & Trust invested large sums of money with Charles Mady, defendant/debtor Ellen Mady's husband.  Repayment of the amounts invested was guaranteed in writing by both Charles Mady and Defendant.  In the present action, Plaintiffs seek to have the amounts owed under the guaranties held non-dischargeable in debtor Ellen Mady's bankruptcy.

 Charles Mady and defendant Ellen Mady were married in 1996. (Tr. Vol. I at 204).  Defendant, a licensed podiatrist, started her own podiatry practice (Feet First, P.C. d/b/a First Feet Podiatry) in 1998. (Tr. Vol. I at 189).  Her husband had both a  real estate broker's license and law license.  (Tr. Vol. I at 204-205).  In 1999, he started his own law practice, sharing space with other attorneys in an office in Livonia, Michigan.[1]  While he

---

[1]Charles Mady graduated from law school in 1994.  Before starting his own law practice in 1999, he worked in his father's real estate business doing legal work and commercial sales/leasing. (Trial Transcript Volume II at 98, hereinafter "Tr. Vol. __ at_). His law firm initially leased office space in an office park in Livonia.  Eventually, he ended

2

was not licensed as a commodities broker or trader, he was interested in buying and selling commodities futures. Defendant testified that her husband started trading on behalf of others some time in 1999. (Tr. Vol. I at 208, 211-212).

Between 1999 and June, 2002, the Madys' standard of living steadily and substantially improved. In 1999, the Madys lived in an apartment in Dearborn, Michigan with rent of approximately $1,000 per month. (Tr. Vol. II at 16). In early 2000, they began to build and furnish a large house in Northville, Michigan. (Tr. Vol. II at 19). The base price of the home was $550,000.00.[2] They purchased and/or leased a Cadillac Escalade.[3] They took expensive vacations. In the spring of 2001, Charles Mady bought a thoroughbred race horse. By May 15, 2002, they owned ten race horses. (Tr. Vol. II at 87).

Defendant testified that she knew nothing regarding how their improved lifestyle was financed. She knew that her father-in-law had helped with the down payment on the house. (Tr. Vol. II at 20). She also knew that she was obligated on the mortgage (although she did not know the amount of the mortgage). (Tr. Vol. II at 21). She knew no other details regarding her financial condition or the financial condition of her husband. She had no idea how much money her husband made and whether that income was derived from

---

up working out of office space in his wife's podiatry practice.

[2]Defendant's father-in-law paid for the lot ($75,000) and helped the couple obtain a mortgage from the Bank of Bloomfield Hills. Defendant's testimony indicates that the home was quite large and very well appointed. (Tr. Vol. II at 31-39). Although Defendant testified to knowing very little about who or how much was paid for major features in the house (such as the pool, brick paver patio and Brazilian wood floors), she conservatively valued the home at $800,000.00. (Tr. Vol. II at 41).

[3]Defendant's bankruptcy schedules indicate that she still owns a Mercedes and still makes payments of $789.14 per month on the Cadillac Escalade.

3

investments or his law practice.(Tr. Vo. Ii at 217).[4]  She had no idea how much money her

podiatry practice generated. She "guessed" (based on Plaintiffs' Counsel's questions) that

her income between 2000 and 2002 was "around a hundred thousand dollars [per year]."

(Tr. Vol. I at 218).[5]

Plaintiff Robert Handelsman met Mr. Mady through a mutual acquaintance in the

spring of 2000.  Mr. Mady was referred to Dr. Handelsman as a successful investor, and

Dr. Handelsman met with Mr. Mady to determine whether to invest funds with him. (Tr. Vol. I

at 9-11).  Dr. Handelsman knew that Mr. Mady was not a licensed broker.  (Tr. Vol. I at

90).[6]

On May 22, 2000, Dr. Handelsman invested $50,000.00 with Charles Mady for a

four month period at a 30% rate of return.  Mr. Mady personally guaranteed the investment

in writing. (Tr. Vol. I at 12).[7]  The investment matured on September 21, 2000, and Mr.

---

[4]It is not clear how much money Charles Mady made between 2000 and 2002. According to his father's testimony he earned in excess of $200,000 the last year he worked for his father.  Defendant testified that, nothwithstanding the fact that they filed joint tax returns, she had no idea how much money her husband made–she could not even estimate it to the nearest $100,000. (Tr. Vol. I at 218).  She knew of at least 13 individuals who had invested money with her husband, but she had no idea how much money had been invested or whether the investments generated profits and/or income. (Tr. Vol. II at 60).

[5]Defendant testified that she has no idea how much money her podiatry practice generates now, although she takes out $4,100 every two weeks, unless she "can't pay a bill" in which case she takes an additional draw.  (Tr. Vol. I at 201).

[6]Plaintiffs Robert and Maurine Handelsman are both doctors.  For purposes of clarity in this Opinion, Robert Handelsman will be referred to as Dr. Handelsman and Maurine Handelsman will be referred to by name.

[7]While a 30% return may seem absurdly aggressive as measured by the market in 2006, Dr. Handelsman testified that measured by market returns at the time, a 30% return

Mady paid Plaintiff the principal plus interest ($65,000), which Dr. Handelsman immediately re–invested with Mr. Mady for another four months, again with Charles Mady's personal guarantee. (Tr. Vol. I at 12-14).

As time progressed, and Dr. Handelsman and Mr. Mady began building a relationship, the Handelsmans considered investing a larger sum of money– both their own money as well as money from their pension and profit sharing accounts. (Tr. Vol. I at 15). Due to the larger sums under consideration, the Handelsmans expressed concern over Charles Mady's ability to repay the obligations if the investments did not produce the anticipated returns. In response to this concern, Mr. Mady offered to personally guarantee the investments. He also offered to have his wife personally guarantee the investments. (Tr. Vol. I at 15). Dr. Handelsman asked for evidence of the Madys' liquidity and asset base and was shown copies of joint tax returns from 1998 to 2000 and a list of assets. (Transcript Vol. I at 18-19, 97-98).

In January, 2001, a meeting was arranged at the Handelsmans' home for the purpose of meeting Defendant. (Tr. Vol. I at 19). According to Dr. Handelsman's testimony, he "wanted absolute assurances that she knew what it was that she was going to be doing. . . "(Transcript Vol. I at 19, 37-38). The Handelsmans specifically asked Defendant whether she understood the implications of agreeing to guarantee the large

seemed reasonable. Dr. Handelsman specifically testified that he had very little expertise in the market and had managed such returns on his own in the past. Given Mr. Mady's professed experience and expertise, a 30% return did not seem overly optimistic. (Transcript Vol. I at 23-24).

investments.[8]  Defendant represented that her husband was a "brilliant" investor and "[s]he

was just totally fine with signing her name to the document[s]".  (Transcript Vol. I at 20, 38,

and 155. Tr. Vol. II at 60).[9]   Defendant signed three guaranties (dated January 11, 2001)--

documents which, on their face, obligated Defendant to repay more than $1,000,000.00 to

the Handelsmans.

       Paragraph 2.3 of the guaranties specifically states:

> 2.3 Guarantors Financial Condition.  As of the date hereof, and after giving
> effect to this guarantee and the contingent obligation evidenced hereby, and
> other obligations arising out of the pool, guarantor is and will be, solvent, and
> has and will have assets which, fairly valued, exceed
> guarantor's obligations, liabilities (including contingent liabilities) and debts, and
> has and will have property and assets sufficient to satisfy and repay guarantor's
> obligations and liabilities.

Defendant testified that she did not read any of the guaranties before she signed them. (Tr.

Vol. II at 72, 75, 180-181).  As of the date of her trial testimony, she still had not completely

read any of the guaranties. (Tr. Vol. II at 65).  Defendant admitted in her deposition that she

did not think that her assets exceeded her liabilities at the time she signed the guaranties.

(Tr. Vol. II at 73).  At trial,  Defendant admitted that she did not know what her husband's

debts and liabilities were at the time she signed the guaranties.  (Tr. Vol. II 73).[10]  Any

---

     [8]According to Dr. Handelsman, they spent  "considerable time in being very specific
about the spirit and the nature of what this was about . . . that she was accepting liability."
(Tr. Vol. I at 96).

     [9]At trial, Defendant testified that she told the Handelsmans her husband was "a
very, very good investor."  Tr. Vol. II at 76).

     [10]During her deposition, Defendant indicated that she thought she was personally
liable on the guaranties only if her husband died i.e. she would pay her obligations under
the guaranties from life insurance proceeds.  (Tr. Vol. II at 65-66).  However, she did not
investigate or confirm the adequacy or availability of such policies.  (Tr. Vol. II at 67).

6

belief Defendant had regarding her (or her husband's) financial condition was based solely on verbal representations from Charles Mady that things were "good". (Tr. Vol. II at 77). While they "never specifically discussed money", Charles Mady always made Defendant "feel comfortable" about their financial situation. (Tr. Vol. I at 89-90).

Once the January 11 guaranties were signed, the Handelsmans invested $1 million dollars with Charles Mady: $130,000.00 on behalf of Robert Handelsman, $320,00.00 on behalf of the Center for Contemporary Psychology Pension Trust, and $550,000.00 on behalf of the Center for Contemporary Psychology Profit Sharing Plan. According to the Handelsmans, they would not have invested those amounts with Charles Mady had the Madys not signed the personal guaranties. (Tr. Vol. I at 19, 27, 56-57, 108-109, 146, 153).

Before those investments matured on May 11, 2005, the parties re-negotiated the arrangement. On April 27, 2001 (at Mr. Mady's request), the Handelsmans rolled the January 11, 2001 investments (principal plus the guaranteed return) into new investments. The new investments were personally guaranteed by the Madys and had rates of return between 27% and 35%. The Handelsmans also invested an additional $5,000 in the name of their son, Dylan. The new investments matured on August 23, 2001, at which time Mr. Handelsman received $1,700,000—the entire amount due under the contracts. (Transcript Vol. I p. 32).[11]

---

[11]On two or three occasions, in an effort to verify where the money was being invested, Mr. Mady showed Dr. Handelsman (at Handelsman's request) brokerage statements from "Lind-Waldock". Dr. Handelsman was led to believe that those accounts included his money as well as money from other investors and some of the Madys' own

7

Over the next nine months (September 12, 2001 to May 15, 2002), the Handelsmans continued to invest funds with Charles Mady. Each time Plaintiffs made an investment, Charles and Ellen Mady signed a guaranty. Each guaranty set forth the guaranteed rate of return and each guaranty included paragraph 2.3 as set forth above. Over the nine month period, the Madys signed 16 guaranties.

As described by Dr. Handelsman, the relationship between the two couples was partly social and partly business. (Tr. Vol. I at 39-41). The Handelsmans visited the Madys' home on several occassions and the couples planned a trip to Aspen together. (Tr. Vol. I at 39). Every outward sign indicated that the Madys were very successful professionals. (Tr. Vol. I at 36-39).

At issue in the present case are the last five guaranties executed by Defendant and Charles Mady. Those guaranties support the following investments:

(1) February 15, 2002, Robert and Maurine Handelsman invested $120,000.00 with a guaranteed rate of 64% and a due date of May 15, 2002;

(2) February 15, 2002, Robert Handelsman Employees Retirement Savings Plan and Trust invested $1,630,000.00 at a guaranteed rate of 27.50% and a due date of May 15, 2002;

(3) May 15, 2002, Robert and Maurine Handelsman invested $417,500.00 at a guaranteed rate of 7.50% and a due date of June 15, 2002

(4) May 15, 2002, Robert Handelsman Employees Retirement Savings Plan and Trust invested $422,500.00 at a guaranteed rate of 7.50% and a due date of June 15, 2002;

---

money. According to Dr. Handelsman, "[t]he monies in those accounts or at least what I believed to be real accounts. . . far exceeded my – his liability to me, their liability to me." (Transcript Vol. I at 29).

8

(5) May 15, 2002, Dylan Handelsman invested $18,225.00 at a guaranteed rate of 7.50% and a due date of June 15, 2002.

These guaranties are of particular importance because Charles Mady never repaid the invested funds and neither Charles Mady nor Defendant honored the guaranties.[12]

From early 2000 to June 2002, Defendant knew that her husband was investing money on behalf of other people. Defendant and her husband would occasionally meet with an investor, or investors would be invited to their home. She also knew that he was not a licensed commodities futures trader and that he could not invest more that $200,000 on behalf of others without a license. (Tr. Vol. I at 212).

On June 12, 2002, the Commodities Futures Trading Commission ("CFTC") filed a Complaint for Injunctive Relief and Other Equitable Relief and Civil Monetary Penalties under the Commodities Exchange Act against Charles Mady, Mady Funding Company and Mady Futures, Inc. in the Federal District Court for the Eastern District of Michigan. The complaint alleged that Charles Mady engaged in unlawful, unlicensed and fraudulent investment and trading activities, including the activities undertaken on behalf of the Plaintiffs. In August, 2002, as part of that action, the federal court appointed a receiver to liquidate Charles Mady's assets. The receiver ultimately collected $1,790,000.00.[13] The most significant assets liquidated by the receiver were the race horses (one race horse sold for $750,000.00, the remaining horses were sold for a total of $209,000.00). Mr

---

[12]To date, Plaintiffs have received three payments totaling $270,885.06: a $90,000 payment from Charles Mady's father (paid through a third party named Rick Schulman), a $40,000 payment from Defendant, and a $140,885.06 payment from the court appointed receiver.

[13]The receiver's expenses were approximately $350,000.00.

9

Mady's various real estate interests sold for $372.500.00.[14]

At the conclusion of the CFTC case, Mr. Mady entered into a consent order which permanently enjoined him from commodities trading. The consent order also directed Mr. Mady to pay restitution to Plaintiffs in the amount of $916,650.00. Other than the $270,885.06 payment noted above, no restitution has been received.

On May 6, 2004, Charles Mady was indicted in federal court on charges of mail and wire fraud, embezzlement of commodity funds and operation of a commodities pool without the appropriate license. On February 16, 2006, Charles Mady pled guilty to two counts of embezzlement. In his guilty plea, Charles Mady stipulated to the following facts:

> From approximately October 1999 through May 2002, Defendant (Charles Mady), received from over ten investors over $12,000,000 which defendant represented he would pool and trade in futures contracts for the benefit of the investors. After receiving investor money, defendant failed to apply portions of the money to trading, or withdrew it from trading, and used the money for his own purposes, including paying it to other investors or using the money for defendant's own expenditures. When defendant embezzled investor money by applying it as above described he was aware that he did so without the consent or knowledge of the investors whose money defendant embezzled. . . . As an example of defendant's embezzlement of investor money, on October 12, 2001, defendant received $1,300,000 from investor Robert H. (Plaintiff) for the purpose of trading commodities futures contracts. Between October 12 and October 26, 2001, defendant utilized over $100 of Robert H.'s money to pay purported profits to investor Richard G., as well as to fund defendant's horse racing expenses, and other personal expenses.

Notwithstanding the plea (which was signed by her husband), Defendant testified that she believes her husband never misappropriated money given to him by investors and that he was "lying" in his plea agreement. (Tr. Vol. II at 61-65). She continues to believe

---

[14]The Mady's home was not liquidated. Defendant continues to reside at the Northville property.

that her husband was a good trader, made money in the market and did not

misappropriate funds invested by others. (Tr. Vol. II at 61-65). According to Defendant,

none of the Madys' personal living expenses were paid from investor funds.

On February 24, 2005, Defendant Ellen Mady filed a Chapter 7 bankruptcy petition.

Her schedules indicate that the current market value of the Northville residence is

$800,000. Her assets include a 2000 Mercedes S 500, a baby grand piano, and 100%

interest in her podiatry business, as well as real estate investments. Her schedules show

net monthly income of $9,004.12 per month and expenses of $14,975.31 per month,

including a mortgage payment of $4,542.31, car payments in excess of $2,400.00 per

month, and a horse boarding fee in the amount of $1,250.00 per month.

In 2004 and 2005, Defendant received substantial financial assistance from her

father- in- law. Question 2 on the Statement of Financial Affairs filed with the Bankruptcy

Court (under penalty of perjury) asks a debtor to:

> State the amount of income received by the debtor other than from
> employment, trade, profession or operation of the debtor's business during
> the two year period immediately preceding the commencement of this case.
> Give particulars.

Defendant's response to this question was "zero dollars". In fact, Defendant's father-in-

law provided Defendant with support in excess of $400,000.00 over the past two years.

(Tr. Vol. II at 51).[15]

On May 16, 2005, Plaintiffs filed an adversary proceeding against defendant Ellen

---

[15]According to Charles Mady's father, since the time his son's assets were frozen
by the CFTC, he has paid approximately 4 million dollars toward the support and legal fees
of his son, the Defendant,and their children. (Tr. Vol. II at 148).

Mady. The Complaint seeks to have Ellen Mady's obligations to Plaintiffs under the guaranties held non-dischargeable under 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B) and § 527(a)(5). A trial on the Complaint was held on May 3 and May 5, 2006.

### III. <u>Analysis</u>

The general rule of Chapter 7 bankruptcy is that a bankruptcy debtor's preexisting financial obligations are discharged and the debtor begins with a clean financial slate. There are, however, several exceptions to the general rule. Those exceptions include: (1) 11 U.S.C. § 523(a)(2)(A), which excepts from discharge a debt obtained by false pretenses, false representation or fraud; (2) 11 U.S.C. § 523(a)(2)(B), which excepts from discharge a debt obtained by the submission of a false written statement; and (3) 11 U.S.C. § 727(a)(5), a denial of discharge where a debtor fails to explain a loss or deficiency of assets.

To avoid the effect of a discharge, the burden is on the creditor to prove that the debt falls within the exception claimed *Hill v. Smith*, 260 U.S. 592 (1923). A creditor must establish a § 523(a)(2)(B) exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991).

### A. <u>Fraud and Misrepresentation under § 523(a)(2)(A)</u>

Section 523 (a)(2)(A) excepts from discharge any debt "for money, property, [or] services . . . to the extent obtained by false pretenses, a false representation, or actual fraud. . . " To prevail on a claim under this section, a plaintiff must show that:

(1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false

12

representation; and (4) its reliance was the proximate cause of loss.
*In re Rembert*, 141 F.3d 277, 280 (6ᵗʰ Cir. 1998). *See also In re Sullivan*, 305 B.R. 809,
823 (W.D. Mich. 2004). The purpose of section 523(a)(2) is to prevent debtors from
retaining the benefits of property obtained through fraud. *In re Omegas Group, Inc.*, 16
F.3d 1443, 1451 (6ᵗʰ Cir. 1994).

While openly false assertions plainly qualify as misrepresentations, "it is well-
established that 'material omissions can [also] form the basis of misrepresentation under §
523(a)(2)(A)." *Sullivan*, 305 B.R. at 823, quoting *McHenry v. Ward (In re Ward)*, 115 B.R.
532, 539 (W.D. Mich. 1990). Even where a party fails to prove the standard traditional
elements of misrepresentational fraud, courts have broadly construed fraud in the context
of § 523 (a)(2)(A).

> Fraud is a generic term, which embraces all the multifarious means which
> human ingenuity can devise and which are resorted to by one individual to gain an
> advantage over another by false suggestions or by suppression of the truth. No
> definite and invariable rule can be laid down as a general proposition defining
> fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by
> which another is cheated.

*Sullivan,* 305 B.R. at 824, *quoting McClellan v. Cantrell*, 217 F.3d 890, 893 (7ᵗʰ Cir.,
2000).

In the present case, Plaintiffs assert that Defendant fraudulently induced them into
investing significant amounts of money with her husband by misrepresenting her husband's
skill as an investor. It is true that Defendant told the Handelsmans that her husband was a
"brilliant" investor (or at the very least, "a very, very good investor"). However, those
statements (even when viewed in conjunction with the appearance of wealth which

13

surrounded the Madys), are not alone sufficient to render Defendant liable under § 523(a)(2)(A) of the Code.

The Court agrees with Plaintiffs that Defendant's statements regarding her husband's abilities as a trader were false. Given Defendant's admitted ignorance of any specifics regarding her husband's activities and financial condition, Defendant's statements were entirely baseless and, therefore, reckless. The Court also agrees that the statements were intended to induce, encourage or persuade the Handelsmans to invest money with Defendant's husband. However, by themselves, the statements cannot be reasonably construed as material statements of fact which a reasonable person would have relied upon in deciding to invest a million dollars. They were statements of opinion offered from a patently non-objective source–Charles Mady's spouse.

Defendant's general, non-specific positive opinion regarding the professional abilities of her husband does not, in the present case, rise to the level of fraud under the Bankruptcy Code. Plaintiff's § 523(a)(2)(A) claim is dismissed.

## B. <u>Written Misrepresentation under § 523(a)(2)(B)</u>

Under § 523(a)(2)(B), a debt is not dischargeable to the extent it is obtained by--

(B) use of a statement in writing--

> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive[.]

14

In the present case, the elements of § 523(a)(2)B) have been satisfied.

**1.  The Guaranties are in Writing**

To fall within § 523(a)(2)(B), the statement must have been written by the debtor, signed by the debtor, or written by another but adopted and utilized by the debtor.  *Insouth Bank v Michael (In re Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001); *Bellco First Federal Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1361 (10th Cir.1997). "The writing required by § 523(a)(2)(B) is sufficiently broad enough to include any statement made by the Debtor, not just formal financial statements and documents in a bank or commercial setting."  *Household Finance Corp. v. Howard (In re Howard)*, 73 B.R. 694, 702 (Bankr. N.D. Ind. 1987).

The written statements at issue in the present case are the special guaranties signed by Defendant and her husband- specifically the five guaranties signed in February and May 2002.  While Defendant did not draft the guaranties, her signature appears on each document and the authenticity of her signature is not disputed.  The guaranties, therefore, satisfy § 523(a)(2)(B)'s writing requirement.

**2.  The Guaranties are Materially False and Relate to Debtor's Financial Condition**

"Section 523 (a)(2)(B) does not cover every material statement of fact made in writing to the creditor to induce the credit.  It is confined in its application to statements about the financial condition of the debtor. . . " *4 Collier on Bankruptcy*  ¶ 523.08[2][c] at 523-48.  Section 523(a)(2)(B)(ii) encompasses not only formal documents like tax returns, balance sheets, income statements and other traditional financial statements (*see*

*Melhorn v. Copeland (In re Copeland)*, 291 B.R. 740, 783 (Bankr. E.D. Tenn. 2003)), but also more general written statements regarding encumbrances, assets and liabilities. *See e.g. Citizens & Northern Bank v. Phillips*, 27 B.R. 646, 657 (Bankr. M.D. Pa. 1982)(dispute over debtor's written statements about encumbrances/ assets); *Engler v. Van Steinburg*, 744 F.2d 1060, 1061 (4th Cir. 1984)("debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition").

The guaranties signed by Debtor in the present case directly address Debtor's financial condition. Paragraph 2.3 of the guaranties states that the "[g]uarantor is, and will be, solvent, and has and will have assets which, fairly valued, exceed Guarantor's obligations, liabilities (including contingent liabilities) and debts, and has and will have property and assets sufficient to satisfy and repay Guarantor's obligations and liabilities." The paragraph unambiguously represents that Debtor and her husband are solvent. It explicitly states that the Madys' assets exceed their liabilities by a margin sufficient to pay Plaintiffs' investments in full.

A written statement that is merely inaccurate regarding a debtor's financial condition is not sufficient to render a debt nondischargeable. To be nondischargeable under § 523(a)(2)(B), the written statement must be "materially false." A written statement is materially false if, "... the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *In re Michael* at 598 (*citing In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).

16

> To be materially false under section 523(a)(2)(B), a false statement must be objectively material, meaning that it must misrepresent information of the type that normally affects the particular type of decision at issue. The actual reliance by the creditor on the false representation is an indicia of materiality. However, actual reliance by itself does not establish materiality and a false statement can be material even if the creditor did not actually rely on it.

4 *Collier on Bankruptcy*, ¶ 523.08[2][b] at 523-47 (Alan N. Resnick, *et. al.*, eds., 15th ed. 2005)(citations omitted).

Was paragraph 2.3 of the guaranties regarding Defendant's financial condition materially false? It certainly offered a "substantially untruthful picture" of the Mady's financial condition. According to paragraph 2.3, the Madys' assets significantly exceed their liabilities. That representation was included in each and every guaranty signed by the Madys. The last such representation was made on May 15, 2002. Less than one month later, Charles Mady was sued by the CFTC. Less than three months later, a Receiver was appointed to liquidate assets. The Receiver was able to recover only $140,885.06 on behalf of the Plaintiffs. Within a reasonably short time of the representation regarding solvency, the value of the assets held by Defendant and her husband proved to be grossly insufficient to cover the liabilities owed to Plaintiffs, much less the total liability to other investors.

Without a doubt, the type of information which was misrepresented in the guaranties was "information of the type that normally affects the particular type of decision at issue." According to Plaintiffs' testimony, testimony which the Court finds entirely credible, the representation in paragraph 2.3 of the guaranties directly affected Plaintiffs' decision to invest a significant amount of money with Charles Mady. From the start of his investment

17

activities with Mr. Mady (i.e. the $50,000 investment dated May 22, 2000), Dr. Handelsman insisted that Mr. Mady provide a personal guaranty. Dr. Handelsman testified that Charles Mady understood the Handelsmans' need to "feel secure" and "comfortable" if they were going to invest larger sums of money–hence Mr. Mady's offer to have himself and his wife personally guaranty future investments. The specific purpose of the guaranty was to give Plaintiffs a high level of comfort in entrusting their assets to Defendant's husband. Paragraph 2.3 had the intended effect. The Handelsmans both testified that, had they believed that the Madys were personally insolvent or unable to repay the amounts invested from personal assets, they would not have continued to invest money with Mr. Mady. It was only after Ellen Mady met with the Handelsmans, indicated that she understood the purpose of the guaranties, and signed the written documents expressly assuring the Handelsmans of the Madys' solvency, that the Handelsmans invested a million dollars with Charles Mady. Each investment made by the Handelsmans thereafter was accompanied by a signed guaranty from Charles and Ellen Mady. Each guaranty reassured the Handelsmans of the Madys' solvency. The Handelsmans repeatedly testified that Ellen Mady's guaranty was "crucial" to their decision to invest money with her husband.

The Court notes that if the amount recovered had been anywhere close to the amount owed to investors, the question of materiality may have been more difficult. The vast difference between the representations in the guaranty and amounts recovered (and the relatively short period of time between the representations in the guaranty and the liquidation of the assets), clearly demonstrates that the statement in the guaranties were

18

materially false.

## 3. **Plaintiffs Reasonably Relied on the Guaranty**

Section 523(a)(2)(B) requires the plaintiff/creditor to establish reasonable reliance

on the written statement. As explained by the Sixth Circuit Court of Appeals:

> Whether a creditor's reliance was reasonable is a factual determination to be made
> in light of the totality of the circumstances. Among the circumstances that might
> affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a
> close personal relationship or friendship with the debtor; (2) whether there had been
> previous business dealings with the debtor that gave rise to a relationship of trust;
> (3) whether the debt was incurred for personal or commercial reasons; (4) whether
> there were any "red flags" that would have alerted an ordinarily prudent lender to the
> possibility that the representations relied upon were not accurate; and (5) whether
> even minimal investigation would have revealed the inaccuracy of the debtor's
> representations.

*BankBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir.

1992)(citations omitted).  Applying these factors to the case at bar, it is clear to the Court

that Plaintiffs' reliance on the written guaranties was reasonable.

Dr. Handelsman did not hand Charles Mady a million dollars at their first meeting.

He invested a relatively small amount of money and let that investment successfully mature

before moving forward with other investments.  While the Handelsmans may have been

enticed by the significant "guaranteed" return being offered by Charles Mady, they did not

plunge ahead thoughtlessly.  Dr. Handelsman and Charles Mady kept in regular contact

with each other and established a relationship.

Before investing what the Handelsmans considered significant money with  Mady,

the Handelsmans asked for verification of liquidity and assets.  The statements, offered as

proof of the Madys' financial condition, were consistent with all of the outward signs of

wealth displayed by the Madys.  While the Handelsmans could have analyzed the tax returns and asset statements more thoroughly, they could not have ascertained that the statements were, if not false, incomplete or misleading.

The Handelsmans made an earnest effort to ensure that Defendant, a well-educated professional woman, understood the nature of the guaranties she was signing.  If Defendant was ignorant of the importance of the guaranties to the Handelsmans, it was not because the Handelsmans did not communicate the gravity of the documents. Defendant's willingness to sign the guaranties without any hesitation whatsoever reinforced the written representation of solvency contained in the documents themselves: the Madys had significant assets as compared to their debts– so much so that Defendant did not even have to stop to think about it.   She was entirely comfortable signing the guaranties.  She could easily have declined to sign the documents when they were presented to her.  She repeatedly chose to sign them.

The verbal assurances of success offered by the Madys in the course of their ongoing social relationship with Plaintiffs, the investment statements, the tax returns and the expensive lifestyle, fully and consistently supported the written representations made in paragraph 2.3 of the Guaranties regarding the Madys' solvency.  While it cannot be said that the Handelsmans made an exhaustive investigation into the Madys' solvency, they made a legitimate effort to broadly verify the Madys' claims.  Under the circumstances of this case, Plaintiffs' reliance on the representations in the guaranties was justified and reasonable.

## 4. <u>Defendant was Grossly Reckless as to the Accuracy of the Guaranty</u>

20

Under § 523(a)(2)(B)(iv), Plaintiffs must show that Defendant signed the guaranty

with intent to deceive.  To prevail, a plaintiff need not provide direct proof of Defendant's

intent.  Rather, a plaintiff

> must show that the debtor intended to deceive **or was grossly reckless as to the accuracy of the written information**.  Intent to deceive may be inferred from the circumstances surrounding the transactions, but all doubts must be resolved in favor of the debtor.  An inference arises where no effort is made to verify the accuracy of the written statement, or where there was no reasonable basis to conclude that the statement was accurate.  The goal is to discern whether the circumstances and the debtor's actions are inconsistent with the assertion of lack of intent.

*Carson v. Chamberlain (In re Chamberlain)*, 330 B.R. 195, 204 (Bankr. N.D. Ohio

2005)(citations omitted)(emphasis added).  *See also In re Martin*, 761 F.2d 1163, 1167

(6th Cir. 1985).  As explained by *Collier on Bankruptcy*:

> The debtor's assertions of an honest intent must be weighed against natural inferences from admitted facts.  The bankruptcy court may consider the totality of the circumstances to make an inference as to whether the debtor submitted a financial statement with an intent to deceive, in that reckless disregard for the truth or falsity of a statement combined with the magnitude of the resulting misrepresentation may combine to support the inference of an intent to deceive.

4 *Collier on Bankruptcy* ¶ 523.08[2][e][ii] at 523-50.

In the present case, the Court finds that Defendant was grossly reckless as to the

accuracy of the representations made in the Guaranties–specifically in paragraph 2.3

regarding solvency.  Defendant's testimony that she believed she and her husband had

assets available to cover the funds invested by Plaintiffs is not credible, and not supported

by any evidence.  In reviewing the record, the Court finds that Defendant was either lying

about her knowledge of the Madys' financial situation, or (more likely)  wilfully blind,

demonstrating a complete disregard for truth and accuracy.  In fact, with the exception of

her testimony regarding Feet First, Defendant's podiatry practice, the Court finds virtually none of Defendant's testimony credible.

Defendant is a well-educated, self-employed professional woman who testified to having a close relationship with her husband. Yet, she knew absolutely nothing about their financial condition. She could not estimate how much money they earned or how much money they spent. She never asked him any questions regarding their finances and, on the rare occasions she expressed any concern about money, accepted general non-informative answers such as "everything is good." Given Defendant's admitted ignorance of their finances, she had no basis for making **any** representations regarding their solvency, let alone a positive representation, in writing, under circumstances designed to induce third party reliance.

Defendant's total lack of concern about where the money to fund the Madys' extravagant lifestyle came from leads the Court to infer that as long as the bills were paid (no matter how extravagant the underlying purchases appeared to be) Defendant believed that her financial life was in order and she need not worry. This may have been true had Defendant not voluntarily made affirmative representations in writing to third parties regarding finances she knew nothing about. This is clearly a case where an inference of intent to deceive arises from the lack of effort made by Defendant in verifying the truth of the statements in the guaranties.

Defendant would have this Court believe that she had no reason to think that she and her husband could not support the expensive lifestyle they had adopted in 2000. A review of the record shows no rational basis for Defendant's belief. Charles Mady was a

22

self-employed attorney who, by 2002, was working out of a back room of his wife's podiatry practice. Even if he had been a successful commodities trader (and his guilty plea demonstrates that he was not successful), he could not have generated the profits that could have sustained the lifestyle the Madys were leading between 2000 and 2002. It is not credible that Defendant, a well-educated, intelligent woman who professed to have a close relationship with her husband, would not have required some explanation as to where he was obtaining money sufficient to support a lifestyle which included ten racehorses. The court concludes that Defendant was not truthful as a witness. At a bare minimum, she knew (or reasonably should have known) that their lifestyle was not paid for by the couple's legitimately earned income.

Even if the Court found Defendant's testimony believable, her inquiry into the source of their income was ridiculously limited. She repeatedly testified that Charles "always made me feel comfortable." She never asked for, nor received, an explanation regarding any aspect of their financial condition. As a competent adult making positive written assertions regarding her finances to third parties, her limited knowledge shows a willful blindness to the truth of their financial situation. Defendant testified about the house, the cars, the trips, and the race horses as if such a lifestyle is the norm for all young couples. Since filing for bankruptcy, she has made no attempt to alter her lifestyle; she has simply substituted money from her father-in-law for the money formerly provided by Plaintiffs and other investors. The facts demonstrate that if defendant was ignorant of her financial condition, it was because she wanted (and continues to want) the expensive lifestyle to which she has become accustomed.

23

When Defendant signed 24 separate guaranties, she did so either knowing that the information was false, or with complete and reckless disregard for the accuracy of the information. The intent of the guaranties was to convince Plaintiffs to continue to give Charles Mady money to invest, notwithstanding the fact that Defendant had absolutely no idea whether she and/or her husband could honor the guaranties. Plaintiffs have satisfied all of the elements of their claim under § 523(a)(2)(B) of the Bankruptcy Code. The debt owed to Plaintiffs under the special guaranties is not dischargeable.

## C. Nondischargeability and Failure to Explain Loss of Assets under § 727(a)(5)

Section 727(a) of the Bankruptcy Code provides that a debtor is entitled to a discharge unless one or more of eight exceptions is met. Although exceptions to discharge are strictly construed, *In re Rembert*, 141 F.3d 277, 281 (6th Cir. 1998), "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor." *Wazeter v. Michigan National Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997).

Section 727(a)(5) provides that the Court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities". 11 U.S.C. § 727(a)(5). Objections to discharge under this section require proof by a preponderance of the evidence and the objecting party bears the burden of proof. *Barclays/American Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393-94 (6th Cir. 1994).

Section 727(a)(5) is broad enough to include any unexplained disappearance or

24

shortage of assets. The initial burden is on the objecting party to introduce some evidence of the disappearance of substantial assets or of unusual transactions. The debtor must then satisfactorily explain what happened.

*Solomon v. Barman (In re Barman)*, 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000)(citations

omitted). "What constitutes a 'satisfactory' explanation for § 727(a)(5) is left to the

discretion of the court. *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R. 803, 817 (1st Cir., 2005).

At its root, a satisfactory explanation under § 727(a)(5) is one that is reasonable under the circumstances. *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993). At a minimum, however, and has often been said, a satisfactory explanation is one that gives more than a mere vague or indefinite statement. *See, e.g., Floret, L.L.C. v. Sendecky (in re Sendecky)*, 283 B.R. 760, 763 (8th Cir. BAP 2002). An important component in ascertaining the reasonableness of any explanation is its capacity for verification; that is, is the explanation sufficient to enable either the trustee or a creditor to properly investigate the circumstances surrounding the loss or deficiency. For example, would the information be sufficient to enable the trustee to track down a potential preferential transfer.

*Baker v. Reed (In re Reed)*, 310 B.R. 363, 370 (Bankr. N.D. Ohio 2004).

Section 727(a)(5) does not include an element of intent or any affirmative defenses.

It imposes strict liability on a debtor who does not satisfactorily explain pre-petition

diminution or loss of assets. *Baker,* 310 B.R. at 368.

Based upon the statute's lack of any culpable mental state required for the denial of a discharge, the propriety of the loss, whether for illegal, immoral or otherwise imprudent activities, is not the direct concern of § 727(a)(5); this is left to other sections of the Bankruptcy Code. Rather, when invoking § 727(a)(5), it is simply the adequacy of explanation which is at issue. *Sonders v. Mezvinsky (In re Mezvinsky)*, 265 B.R. 681, 690 (Bankr. E.D. Pa. 2001). [Additional citations omitted]. Accordingly, as applied to § 727(a)(5), whether the Debtor engaged in the wrongful disposition of assets is only relevant to the extent that it pertains to a satisfactory explanation; in insolation, the alleged wrongful nature of his conduct has no bearing. *Indian Head Nat'l Bank v. Mitchell (In re Mitchell)*, 74 B.R. 457 (Bankr. D.N.H. 1987)(illegal activities in themselves do not operate as a bar to discharge).

*Baker*, 310 B.R. at 368.

In the present case, Plaintiffs § 727(a)(5) claim fails because there is no "unexplained disappearance or shortage of assets." The assets which Defendant claimed to own at the time the guaranties were signed were accounted for by the receiver. It is true that prior to Defendant's bankruptcy filing, Debtor's assets were over-valued, misappropriated, lost in market transactions or non-existent. It is also true that Defendant grossly misrepresented her income for the two years preceding her bankruptcy filing (i.e. a substantial portion of her income over that time came from her father in law–a fact omitted on both the Statement of Financial Affairs and Schedule I). The facts seriously undermine Defendant's credibility. However, they do not support a claim under § 727(b)(5). Defendant's loss of assets is fully documented in the report of the receiver appointed to liquidate Charles Mady's assets. Plaintiff's claim under 11 U.S.C. § 727 (b)(5) is dismissed.

## IV. <u>Conclusion</u>

For the reasons stated in this Opinion, the Court finds that Plaintiffs have not met their burden of proof as to claims under 11 U.S.C. S 523(a)(2)(A) and 727(a)(5). Those claims are, therefore, dismissed. The Court finds that Plaintiffs have met their burden of proof as to the claim under 11 U.S.C. S 523(a)(2)(B). The Court finds that Plaintiffs' have a non-dischargeable claim in the amount of $ 2,337,369.94 ($2,608,225.00– the amount which Defendant induced Plaintiffs to invest pursuant to the two guaranties dated February 15, 2002 and the three guaranties dated May 15, 2002– less $270,885.06 paid to date).

**NOT FOR PUBLICATION**

Entered: June 07, 2006

                            /s/ Marci B. McIvor
                        Marci B. McIvor
                        United States Bankruptcy Judge